THOMAS M. FURY, PROSECUTOR, v. NEW YORK AND LONG BRANCH RAILROAD COMPANY, DEFENDANT.

Argued May 9, 1940—Decided December 9, 1940.

Before Justices CASE, DONGES and HEHER.

For the prosecutor, *Quinn & Doremus* (*Vincent J. McCue*, of counsel).

For the defendant, *Applegate, Stevens, Foster & Reussille* (*John S. Applegate* and *Ida K. Hildebrand*, of counsel).

The opinion of the court was delivered by

HEHER, J. *Certiorari* was granted to review a judgment of the Monmouth Court of Common Pleas reversing an award by the Compensation Bureau in favor of an injured employe of the defendant railroad company, under *R. S.* 1937, 34:15-1, *et seq.*

The decisive question is whether an accident concededly suffered by the employe arose out of and in the course of his employment; and we resolve it in the affirmative.

The defendant employer (to be hereafter referred to as the "Long Branch Company") is the owner of a railroad extending from a junction with a railroad of The Central Railroad Company of New Jersey (to be referred to as the "Central Company") at the north end of the bridge across Raritan Bay, in the county of Middlesex, to a junction with a railroad of The Pennsylvania Railroad Company (to be referred to as the "Pennsylvania Company") at Bayhead, in the County of Ocean. Railroads of the Long Branch Company and the Central Company intersect at Matawan, with switches and tracks permitting the transference of rolling stock from one to the other. On January 31st, 1930, these companies entering into a tripartite agreement, whereby the Long Branch Company granted to the Central Company and the Pennsylvania Company use of its railroad line, for a term of 999 years, upon certain terms and conditions. It was therein also agreed that the Central Company, subject to the approval of the Pennsylvania Company, "shall designate one of its Operating Officials who shall be appointed Superintendent of the Long Branch Company, and, in connection with his other duties, shall have charge of the operation and maintenance of its property, line, facilities and appurtenances;" that "The line, facilities and appurtenances of the Long Branch Company shall be kept in good repair, working order and condition, so as to permit the Operating Companies to fully enjoy the use thereof" therein provided for; and that "No switching service shall be performed on the line of the Long Branch Company by either of the Operating Companies, except upon authority of its Superintendent," and, "Unless so authorized, all switching on the line of the Long Branch Company shall be performed by it, and to enable it so to do, the Operating Companies shall furnish the necessary equipment" at rates to be fixed by mutual agreement.

It was further stipulated that nothing therein contained should affect the pre-existing "arrangements * * * between the Long Branch Company and the Central Company or the

Pennsylvania Company with respect to the operation and maintenance of facilities now used jointly and the division of the expenses thereof." Such facilities were listed in a schedule annexed to the agreement: and it was therein provided that the signal tower at Matawan (near which the mishap occurred) "shall be joint between the Central Company and the Long Branch Company," the former to bear twenty-seven per cent. and the latter seventy-three per cent. "of the expense of operating and maintaining the same;" and that "The train control sub-station" nearby "shall be joint between the Central Company and the Long Branch Company, and the Long Branch Company shall furnish the Central Company electric current required by it thereat," the Central Company to bear nineteen per cent. and the Long Branch Company eighty-one per cent. "of the expense of operating and maintaining said sub-station," and the Central Company also to "pay for all electric current furnished it, and in addition the sum of $9.50 per month representing its share of the interest on the cost of such sub-station."

Thus it is that there is a very close and intimate relationship between the Long Branch Company and the Central Company.

It will be useful to delineate the *locus*. At the junction, the line of the Long Branch Company runs generally east and west, and the intersecting line of the Central Company northeasterly and southwesterly. The tower was situated close to the point of junction, south of the Long Branch Company's tracks and west of the Central Company's track. The sub-station was located on the Central Company's lands east of its track and north of the tracks of the Long Branch Company, a distance of 166 feet from the tower.

The accident occurred on January 29th, 1935. Prosecutor was then, and for several years had been, in defendant's employ as a "signal maintainer." As such, he was under a constant duty to inspect signal equipment at the *locus,* including the interlocking plant, crossing signals, roadside train signals, and switches, and to render such service as was needed for continuous function. The tower and sub-station, and roadside signals and switches nearby, were all part of an

interlocking plant required for the operation of trains across the intersection and the transfer of such from one railroad to the other; and the switches on both railroads nearby were controlled from the tower. The Long Branch Company and the Central Company had one supervisor of signals whose territory embraced the junction; and the former's assistant train master testified that his company operated all switches in the vicinity of the junction—the switches along the right of way of the Central Company as well as those on the line of his employer. The supervisor of signals testified that prosecutor's duty included the "inspection of bond wires on the rails—the two galvanized wires around the joints," and also "the insulated joints of the switches; * * * the signals themselves, at the transformers on the power lines, the line wires on the pole, as well as the wires and relays and signal cases." It was prosecutor's obligation, the witness said, to inspect the sub-station "at least once a week," and particularly when there was any indication of disarrangement of the mechanism. Like other maintenance men, he was also required to watch for broken rails and other abnormal conditions that would render operation unsafe. And, when the occasion demanded, he was obliged to signal operators of trains and take such other measures as were needful for the protection of the public, passengers, train crew, and property. Summarizing this employe's duties, the assistant train master said: "His duties were to maintain the signal system, to inspect bond wires, and repair switches, and to see that everything was operating well, and the circuit boxes there to inspect the sub-station," and "to repair" the sub-station, if necessary. He was both an "inspector" and a "repairman."

Prosecutor's regular working hours were from eight A. M. to five P. M. On the day in question, at five P. M., or within a few minutes thereafter, he walked from the tower across the tracks of the Long Branch Company and thence across the track of the Central Company to the sub-station. He had reason to believe that the mechanism there required adjustment, and, finding that this was so, he labored for an hour on the generator and commutator. He then proceeded northeast between the rails of the Central Company's single track

(the ground was covered with a foot of snow and ice, and the cleared track afforded the only pathway), intending to leave the right of way about 400 feet from the sub-station for his home nearby. Before he reached that point, he was struck by a train of the Central Company and sustained the disabling injuries for which compensation is sought. The mishap occurred approximately 320 feet from the signal tower, and not much more than 160 feet from the sub-station. He testified that this was the way customarily used by himself and other workmen upon leaving the junction at the close of the day's work.

It is maintained by the defendant employer that the mishap did not arise out of and in the course of the employment, since prosecutor had completed "his day's work," and had taken "a route of his own choice, * * * not on the premises of his employment," but one "over which the employer" had "no control, without the express or implied consent of his employer, exposing himself to a risk which is not a necessary concomitant of his employment." It is said further that "The burden (of compensation) should not be placed upon the employer when an employe, who has left the premises of his employer, chooses to take a dangerous route," and that, in the circumstances, the employe was a trespasser on the right of way of the Central Company. The point is not well made.

Although the employe had completed his regular period of service, the evidence establishes—much of it came from the employer's own witnesses—that this duty of inspection and repair connoted unremitting vigil while the one so charged was within the area of service; and that it was not only the workman's province, but his duty as well, when in his view it was prudent so to do, to inspect the signal mechanism, switches, and so on, and to undertake such corrective measures as the circumstances warranted, even though his regular hours of service had come to an end. This employe's domain of inspection embraced the Central Company's right of way from the intersection to and beyond the point of the mishap, for in that space were located signals and switches constituting a part of the interlocking signal plant essential to the switching of trains from one railroad to the other at the

junction. One of these signals was placed directly opposite the scene of the accident; and it was likewise incumbent upon him to see that the switches (one of which also was nearby) were kept free of snow and ice.

The contract of service is not to be given the narrow construction propounded by the employer. There clearly rested upon the particular employe a much broader duty—one designed to minimize the dangers of rail operations. Service beyond the normal hours was frequently necessary; and the employer rendered due compensation. And whenever, in the opinion of prosecutor, the need existed, he was in duty bound to proceed without specific authority. A less rigorous rule would add to the hazards of a service in which danger is ever present. On this occasion, the elements exacted extra precaution as regards the operating efficiency of switches and signals; and, in our view, it is a corollary of the employer's contention that the inspection of the sub-station and the readjustment of the mechanism fall into the same category of things done after the usual hours of service had terminated—an interpretation that would do violence to the contract of service as revealed by long-established practice. To hold that one so situated could not make inspections and needed repairs without forfeiting his status as an employe, since the regular hours of service had ended, would be to penalize the faithful employe for that initiative, fidelity and zeal which have ever been deemed ideals of service, as well as to countenance a doctrine that would jeopardize human safety, not to mention property, in a wide field peculiarly affected with a public interest. The employe who gives more than required by the strict letter of the contract of employment would be, as regards the extra service, beyond the protection of the Compensation act, even though there be an acceptance of the service. To say that such was within the contemplation of the parties would be a wholly arbitrary interpretation distortive of the plainest implications.

In seeking for the intention of the parties to this contract of general hiring—necessarily the controlling consideration—regard must be had to the attendant circumstances and the object in view, and also the course of practice of the parties

in its execution, since that is significant of the common purpose respecting the nature and scope of the hiring. And reason should, of course, govern in the interpretation.

Nothing more need be said, it seems to us, to demonstrate the utter fallacy of the employer's contention, adopted by the Common Pleas judge, that, at the time of the mishap, the employe was a trespasser upon the Central Company's lands and wholly outside his employment.

The employment had not ended when the accident happened. While proescutor was then on his way home, he was yet within the inspection territory; and so he was still bound to exercise his powers of observation with a view to the detection of faults in the signal system and switching mechanism, and all obstacles to their normal functioning, as well as to discover any other menace to safety of operation along the right of way, and to take timely remedial measures. A failure in this respect would plainly be classable as a breach of duty. He had not departed from his employment while he remained within the ambit of service. He was not then "on his own," as in *Gullo* v. *American Lead Pencil Co.*, 119 *N. J. L.* 484. Compare, also, *Terlecki* v. *Strauss*, 85 *Id.* 454; *affirmed*, 86 *Id.* 708; *Bolos* v. *Trenton Fire Clay, &c., Co.*, 102 *Id.* 479; *Lehigh Navigation Coal Co.* v. *McGonnell*, 120 *Id.* 428; *affirmed*, 121 *Id.* 583.

In the circumstances, there was indubitably a causal connection between the injury and the employment. The relationship was such as to warrant classification of the risk as reasonably incident to the employment. The hazard was a natural consequence of what the employe was obliged to do in the fulfillment of his contract of service. It is pertinent to note here that it suffices if the employment was substantially contributory to the injury. *Vide Cudahy Packing Co.* v. *Parramore*, 263 *U. S.* 418; 43 *S. Ct.* 153; 68 *L. Ed.* 366; 30 *A. L. R.* 532; *In re Madden*, 222 *Mass.* 487; 111 *N. E. Rep.* 379.

And it is also to be observed, without necessarily implying that that in itself would be determinative in the same direction, that the sole alternative course open to prosecutor, after he had departed from the sub-station, was over the right of

way of his employer—a double track railroad with a much greater volume of traffic and a correlative increase of risk. The course he took was the most direct way home, and clearly it was the least dangerous. Indeed, there was no other available route until he reached the bypath some 100 feet beyond the place of the mishap, unless he pursued the roundabout and more hazardous course over the railroad of his employer. Compare, in this connection, *Cudahy Packing Co.* v. *Parramore, supra; Bountiful Brick Co.* v. *Giles,* 276 *U. S.* 154; 48 *S. Ct.* 221; 72 *L. Ed.* 507.

The judgment of the Court of Common Pleas is accordingly reversed, and the judgment of the Compensation Bureau affirmed, with costs.